**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
FEBRUARY 13, 2025

*Stephens, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
FEBRUARY 13, 2025

*Sarah Pendleton*
SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JOHN DOES 1, 2, 4, and 5, | ) | No. 102182-8 |
| Respondents, | ) | EN BANC |
| JANE DOE 1 and JOHN DOE 3, | ) | Filed: <u>February 13, 2023</u> |
| Plaintiffs, | ) | |
| v. | ) | |
| SEATTLE POLICE DEPARTMENT and the SEATTLE POLICE DEPARTMENT OFFICE OF POLICE ACCOUNTABILITY, | ) | |
| Cross-Petitioners, | ) | |
| and | ) | |
| SAM SUEOKA, | ) | |
| Petitioner, | ) | |
| JEROME DRESCHER, ANNE BLOCK, and CHRISTI LANDES, | ) | |
| Defendants. | ) | |

MONTOYA-LEWIS, J.— The Public Records Act (PRA)[1] "is a strongly worded mandate for broad disclosure of public records." *Hearst Corp. v. Hoppe*,

---

[1] Ch. 42.56 RCW.

90 Wn.2d 123, 127, 580 P.2d 246 (1978).  Enacted by initiative in 1972, the PRA reflects the policy of Washington State that full public access to information about government conduct is critical to "the sound governance of a free society." LAWS OF 1973, ch. 1, §1(11); *Spokane Police Guild v. Liquor Control Bd.*, 112 Wn.2d 30, 33, 769 P.2d 283 (1989).  This case involves requests for public records regarding the actions of public employees at a public event: Seattle Police Department (SPD) officers who attended a rally in Washington, DC, referred to as "the January 6th rally."  The strong presumption for the release of public records is not without limits, and this case exists at the junction between the PRA, the public's right to governmental records, and the SPD officers' interests.

The PRA exempts some public records from disclosure, balancing the imperative that the people remain informed against narrow privacy rights or government interests that may, at times, outweigh the PRA's broad policy in favor of disclosure.  RCW 42.56.030; *Resident Action Council v. Seattle Hous. Auth.*, 177 Wn.2d 417, 432, 327 P.3d 600 (2013).  It also provides mechanisms for agencies to withhold exempt public records and for the subjects of those records to raise objections to release on the basis of those exemptions.  *E.g.*, RCW 42.56.070(1), .080(2), .540.  However, PRA exemptions "are '*narrowly tailored to specific situations* in which privacy rights or vital governmental interests require

2

protection.'" *City of Lakewood v. Koenig*, 182 Wn.2d 87, 93, 343 P.3d 335 (2014) (quoting *Resident Action Council*, 177 Wn.2d at 434); *see also* RCW 42.56.030 ("This chapter shall be liberally construed and its exemptions narrowly construed.").

Here, several members of the public made records requests to the SPD regarding police officers who were present in Washington, DC, on January 6, 2021, and their activities there that day. The officers anonymously sued SPD, the Office of Police Accountability (OPA), and the requestors to prevent the release of their identities within those public records. The officers sought a preliminary injunction, arguing their identities should be exempt from disclosure based on statutory and constitutional privacy rights. However, the requested records relate to their activities at a highly publicized and public event. On this limited record, it appears that the officers have not demonstrated a likely privacy interest in such information under either theory, so they have not shown a likelihood of success on the merits that the information falls under any exemption to the release of public records under the PRA. However, the trial court proceedings occurred without clear guidance from this court on these issues, so we provide that guidance here. It appears that the trial court did not err in denying the preliminary injunction, but we remand for further proceedings based on this opinion. For similar reasons, the officers have not shown a need to proceed anonymously under pseudonym. We reverse the Court of Appeals.

FACTUAL BACKGROUND

This case involves requests for public records regarding public employees' involvement in events that took place in Washington, DC, on January 6, 2021, relating to the results of the 2020 presidential election. We provide the historical context here.

Joseph R. Biden was elected President of the United States in November 2020, receiving the majority of both the popular and electoral vote. Clerk's Papers (CP) at 534; *see also* U.S. FED. ELECTION COMM'N, FEDERAL ELECTIONS 2020: ELECTION RESULTS FOR THE U.S. PRESIDENT, THE U.S. SENATE, AND THE U.S. HOUSE OF REPRESENTATIVES 5-7 (2022).[2] After then president Donald J. Trump lost the election, he did not concede but, instead, disputed the election results, repeatedly claiming to news outlets and on social media the election was "stolen" from him. CP at 534-35; *see also* H.R. REP. NO. 117-663, at 5, 195-231 (2022) (SELECT COMMITTEE FINAL REPORT).[3] As the time for Congress to certify the Electoral College results (as required by law) on January 6, 2021 approached, Trump planned a rally in Washington, DC—dubbed "Stop the Steal" and "Save America Rally"—

---

[2] https://www.fec.gov/resources/cms-content/documents/federalelections2020.pdf [https://perma.cc/59V2-3WKV]

[3] https://www.govinfo.gov/content/pkg/GPO-J6-REPORT/pdf/GPO-J6-REPORT.pdf [https://perma.cc/3DZ7-C7V6]

which he promised his supporters would be "'wild.'" CP at 535 (quoting Dan Barry & Sheera Frenkel, *'Be There. Will Be Wild!': Trump All but Circled the Date*, N.Y. TIMES (Jan. 6, 2021)[4]); *see also* SELECT COMMITTEE FINAL REPORT at 55. Members of extremist groups, such as the Proud Boys, Oath Keepers, and Three Percenters, heard this call to action and shared on social media their intent to attend the rally and to overturn the election. CP at 537; SELECT COMMITTEE FINAL REPORT at 55-60.

Approximately 45,000 people from around the country gathered at Trump's rally at the National Mall on January 6, 2021, where he reiterated his claims that the election was "stolen" and urged that Congress should not finalize Biden's presidential victory by certifying the election. CP at 535; *see also, e.g.*, SELECT COMMITTEE FINAL REPORT at 71; *Transcript of Trump's Speech at Rally before U.S. Capitol Riot*, ASSOCIATED PRESS (Jan. 13, 2021, 6:11 PM).[5] Trump encouraged everyone at the rally to march to the Capitol building to confront Congress. CP at 535-36 (citing Julia Jacobo, *This Is What Trump Told Supporters before Many*

---

[4] https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html
[5] https://apnews.com/article/election-2020-joe-biden-donald-trump-capitol-siege-media-e79eb5164613d6718e9f4502eb471f27

*Stormed Capitol Hill*, ABC NEWS (Jan. 7, 2021, 10:03 AM)[6]); *see also, e.g.*, SELECT COMMITTEE FINAL REPORT at 231-33, 499-502.

Thousands of demonstrators did so. CP at 536; *see also, e.g.*, SELECT COMMITTEE FINAL REPORT at 637-50. Though they first gathered in front of fenced off areas following the rally, a group of demonstrators soon breached the outermost barriers to the Capitol grounds and, over the next few hours, broke into the Capitol building in an increasingly violent mob that law enforcement declared a "riot." CP at 536 (citing Lauren Leatherby et al., *Visual Investigations: How a Presidential Rally Turned into a Capitol Rampage*, N.Y. TIMES (Jan. 12, 2021)[7]); *see also, e.g.*, SELECT COMMITTEE FINAL REPORT at 50-66, 77-78.

In the aftermath, the FBI issued a public call for tips and digital media to help identify those involved in the riot. CP at 537 (citing Tom Jackman, *FBI Appeals for Information from Public on Capitol Rioters*, WASH. POST (Jan. 7, 2021, 12:40 AM)[8]). More than 1000 people have been charged with crimes for their actions that day, ranging from seditious conspiracy to trespass and assault. *E.g.*, *id.* (citing Clare Hymes et al., *What We Know about the "Unprecedented" Capitol Riot*

[6] https://abcnews.go.com/Politics/trump-told-supporters-stormed-capitol-hill/story?id=75110558 [https://perma.cc/Z5GW-Y7JQ]
[7] https://www.nytimes.com/interactive/2021/01/12/us/capitol-mob-timeline.html
[8] https://www.washingtonpost.com/dc-md-va/2021/01/06/dc-protests-trump-rally-live-updates/#link-2U3TQIWLN5BTLMYGPJ6AFD3SRQ

*Arrests*, CBS NEWS (Aug. 11, 2021, 6:36 PM)[9]); SELECT COMMITTEE FINAL REPORT at 56; *The Jan. 6 Attack: The Cases behind the Biggest Criminal Investigation in U.S. History*, NAT'L PUB. RADIO (Feb. 9, 2021, last updated Oct. 4, 2024, 9:47 PM).[10] Many of those charged with crimes or otherwise known to have participated in the riot are affiliated with white supremacist, antigovernment, and other extremist groups and militias. *E.g.*, CP at 537; SELECT COMMITTEE FINAL REPORT at 66, 507-16, 519-21, 653-55.

Some of the people who participated in these events worked as active law enforcement officers. CP at 537. At least 29 current and former police officers attended the rally, with some proceeding to the Capitol. *E.g.*, Hymes et al., *supra;* Kimberly Kindy et al., *Off-Duty Police Were Part of the Capitol Mob. Now Police Are Turning in Their Own*, WASH. POST (Jan. 16, 2021);[11] Eric Westervelt, *Off-Duty Police Officers Investigated, Charged with Participating in Capitol Riot*, NPR (Jan. 15, 2021, 1:07 PM).[12] At least 15 of those arrested were either former or active law enforcement officers. *E.g.*, CP at 537; Hymes et al., *supra*.

---

[9] https://www.cbsnews.com/news/us-capitol-riot-arrests-latest/ [https://perma.cc/5Q34-9KZX]

[10] https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-and-their-stories

[11] https://www.washingtonpost.com/politics/police-trump-capitol-mob/2021/01/16/160ace1e-567d-11eb-a08b-f1381ef3d207_story.html

[12] https://www.npr.org/2021/01/15/956896923/police-officers-across-nation-face-federal-charges-for-involvement-in-capitol-riot

SPD learned that two SPD officers had posted photographs of themselves at the demonstration in Washington, DC, on Facebook on January 7, 2021. This prompted OPA to investigate whether any SPD officers violated the law or SPD policies by their actions on January 6th. Four additional SPD officers later self-reported to OPA that they attended portions of the demonstration, and OPA investigated all six officers.

In January and February 2021, SPD received several requests for public records related to any SPD officers who participated in the events in Washington, DC, on January 6th. The city did not identify any clearly applicable exemption requiring redaction of any information. SPD notified the six officers that it intended to produce public records including their names in response to the requests.

PROCEDURAL HISTORY

The six officers filed suit in King County Superior Court against SPD, OPA, and the requestors to prevent the production of the public records. In the complaint, the officers alleged the requested records fall under PRA exemptions for investigative records or private personal information of public employees. CP at 7-12 (citing RCW 42.56.240(1); former RCW 42.56.250(6) (2020), *recodified as* RCW 42.56.250(1)(f) (LAWS OF 2023, ch. 458, § 1); RCW 42.56.230(3)). They also

asserted disclosure would violate their constitutional rights because the records relate to constitutionally protected activities under the First Amendment. U.S. CONST. amend. I. The officers requested injunctive relief under RCW 42.56.540 and declaratory judgment that the information "is exempt from disclosure under the PRA." *Id*. at 14-15.

The superior court granted the SPD officers' motion for a temporary restraining order (TRO) enjoining the city from producing responsive records and granted their motion to proceed in pseudonym as Jane and John Does 1-6.

The officers then filed their first motion for a preliminary injunction, which the court denied. The TRO was extended and the release of the records stayed to permit the officers to seek an emergency appeal.

*1.    The First Appeal and the OPA Findings*

The officers appealed the denial of the first motion for preliminary injunction, and the appeal was transferred to this court as *Does 1-6 v. Seattle Police Department*, No. 99901-5 (*Does* I). At that time, the officers primarily argued the records should not be released while OPA's investigation was ongoing.

But on June 28, 2021, OPA concluded its investigation and publicly released its closed case summary detailing its findings. OPA had consulted federal law enforcement officials and reviewed video and photographic evidence collected by

9

federal law enforcement. OPA also interviewed each of the six officers and asked to review their e-mails, receipts, text messages, and photographs. One officer claimed he may have texted people on January 6th, but he deleted his texts daily. Two officers provided photographs, which OPA found were largely irrelevant. One officer refused to provide any documents to OPA.

Without identifying any of the officers by name, the OPA report found that all six officers attended Trump's rally together on the morning of January 6, 2021, and two of the officers went on to trespass on the grounds of the U.S. Capitol.

OPA concluded that the allegations of misconduct were sustained as to the two police officers who trespassed at the Capitol. Those officers went to the Capitol after the rally and were caught on camera in restricted areas of the grounds, outside of the buildings. OPA concluded those officers violated the law, engaged in unprofessional behavior that undermined public trust in the SPD, and failed to report their misconduct of criminally trespassing. They were subsequently terminated.

As to the other four officers who attended the rally with them, OPA found the allegations of misconduct were not sustained and were labeled either unfounded or inconclusive. For three officers, OPA found no evidence they committed illegal acts. They traveled to Washington, DC, and attended the rally, but they denied going to the Capitol afterward and denied association with anyone involved in the violence

there; other evidence corroborated their claims that they had gone to a restaurant and then to their hotel after the rally, during the time of the riot.

For one officer, OPA's findings were inconclusive because he went to the vicinity of the Capitol after the rally and may have entered a restricted area on the grounds like the first two officers, but no evidence confirmed or disproved that he trespassed.

OPA did not recommend finding those four officers violated SPD standards of professionalism because their attendance at the rally, "absent any acts on their part that were illegal," was protected by the Constitution and would not be cause for adverse employment action. CP at 552.

These findings were all made public in OPA's closed case summary in June 2021, while the officers' first appeal in *Does* I was pending. This court determined review of the first denied preliminary injunction was moot in light of the changed circumstances of the release of the OPA report. *Id*. at 561 (Ord. Dismissing Rev., *Does* I, No. 99901-5, at 1 (Wash. Nov. 17, 2021)). We dismissed the case and remanded to the trial court for further proceedings. *Id.* The superior court extended the TRO until the motion for preliminary injunction would be decided.

2. *The Instant Motions and Rulings*

Back in superior court, PRA requestor Sam Sueoka moved to change the case title and bar the use of pseudonyms. He also sought leave to file several exhibits he believes should be part of the public court file (the "disputed exhibits"), which, he argues, show that the officers who attended the January 6th events have been publicly identified online and have not received the kind of harassment they expected. CP at 454, 469; CP (Sealed) at 1625-72 (ex. 16-22, 24).

Respondents/plaintiffs John Does 1, 2, 4, and 5 are the four officers who attended the rally but whose misconduct allegations were not sustained by OPD.[13] Also, four SPD officers identified as John Does 7-10 attempted to intervene to oppose Sueoka's motion to file the disputed exhibits unsealed; they claimed to be the officers identified in the disputed exhibits. CP at 1245-56. Does 7-10 were represented by different attorneys from Does 1, 2, 4, and 5, and counsel claimed they did not know if they represent the same people. 2 Rep. of Proc. (RP) (Jan. 28, 2022) at 78-84. The court denied the motion to intervene without prejudice because it is possible the intervenors are already parties to the case, and a party cannot intervene

---

[13] The two officers about whom the allegations of misconduct were sustained, Jane Doe and John Doe 3, have been terminated from SPD and are no longer part of this appeal.

in a case where they are already a plaintiff. *Id*. at 84-85; CP at 1441. The disputed exhibits were filed under seal.

The officers filed a second motion for a preliminary injunction, this time asserting a statutory exemption and an alternative constitutional argument for exempting the records. They primarily argued they likely have a right to privacy under the PRA because OPA found no substantiated misconduct and their political activities are private. They argued in the alternative that they have a right to privacy in their attendance at the rally as an exercise of First Amendment rights. Specifically, they requested an injunction protecting their identities from disclosure under the PRA.

The superior court again denied the preliminary injunction. The court determined the officers failed to make the first required showing for a preliminary injunction—that information in the public records is likely exempt—because information about "[w]hether a person attended a public rally is not the type of intimate detail" protected by the right to privacy, as "[a]ttending a public rally is not an act that is inherently cloaked in privacy." 2 RP at 90; CP at 1440. The court also noted the officers had not introduced any evidence that the requested public records contain explicit information about their political beliefs or associations, and

13

disclosing their identities "does not prevent them or anyone else from exercising their First Amendment rights and attending a rally." 2 RP at 93.

The court also denied the motion to change the case title and prohibit the officers from proceeding in pseudonym, reasoning that it would effectively prevent the officers from obtaining the relief they ultimately seek.

### 3.     *The Second Appeal*

The officers appealed and Sueoka cross appealed on the pseudonym issue. The Court of Appeals reversed the denial of the preliminary injunction. *John Doe I v. Seattle Police Dep't*, 27 Wn. App. 2d 295, 304, 531 P.3d 821 (2023) (*Does* II), *review granted*, 2 Wn.3d 1001 (2023). It concluded the First Amendment alone prohibits disclosure of the officers' identities. *Id*. at 304-06. The Court of Appeals did not evaluate whether disclosure would violate the officers' statutory right to privacy under the PRA but considered only whether the officers have a right to anonymity in political belief or association under the First Amendment. *Id*. at 321-61. It also rejected the two-part PRA injunction standard set forth in RCW 42.56.540 and *Lyft, Inc. v. City of Seattle*, 190 Wn.2d 769, 418 P.3d 102 (2018), reasoning that "establishment of the [First Amendment] right itself mandates the issuance of an injunction." *Does* II, 27 Wn. App. 2d at 356. Further, it held that the city, as the agency responsible for responding to public records requests, must

refuse to disclose records when it is clear a third party's constitutional rights are implicated and must defend any challenge to that action. *Id*. at 359 n.43. It affirmed the denial of Sueoka's motion to preclude the officers' use of pseudonyms. *Id*. at 367-68.

Sueoka petitioned for review, raising both the pseudonym issue and the PRA issues. The city raised the issues relating to agencies' responsibilities in its answer. We granted Sueoka's petition for review and granted review of all the issues raised. Amici briefs have been filed by the State of Washington; Washington State Association of Municipal Attorneys; Washington Coalition for Open Government; and the American Civil Liberties Union of Washington, Fred T. Korematsu Center for Law and Equality, Unidos, the Washington Coalition for Police Accountability, and the Clark County Justice Group.

## ANALYSIS

This is a PRA case. Members of the public requested certain public records, and the city determined it would produce whatever nonexempt responsive public records it held, in accordance with its obligation under the PRA. RCW 42.56.070(1). The officers' complaint requested declaratory relief that the officers' personal identifying information "is exempt from disclosure *under the PRA*" and an injunction under RCW 42.56.540. CP at 2, 14-15 (emphasis added). The case is

now before us on a motion for a preliminary injunction, where the officers argue their rights to privacy under both the PRA and the First Amendment provide exemptions to the PRA's broad presumption of disclosure. They do not seek to prevent the disclosure of the public records in their entirety; they argue only that their identities and personally identifying information should be redacted. This case remains in a preliminary stage, and the requested records have not yet been made part of the case file or been reviewed in camera by any court.

The provisions of the PRA "shall be liberally construed and its exemptions narrowly construed" to promote the policy of free and open examination of public records. RCW 42.56.030; *see also, e.g.*, *Bellevue John Does 1-11 v. Bellevue Sch. Dist. No. 405*, 164 Wn.2d 199, 209, 189 P.3d 139 (2008). Upon receiving a PRA request, government agencies "shall make available for public inspection and copying all public records, unless the record falls within" a specific exemption under the PRA "or other statute which exempts or prohibits disclosure of specific information or records." RCW 42.56.070(1). "'Public record' includes any writing containing information relating to the conduct of government or the performance of any governmental or proprietary function prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics." RCW 42.56.010(3). All agree that the documents and information requested in this

case, including the officers' names, are public records. We review decisions under the PRA and issues of statutory construction de novo. *Bellevue John Does*, 164 Wn.2d at 208-09.

I.     Injunction Standard

The officers seek a court order enjoining the city from disclosing their identities within the requested public records. A court may enjoin examination of a specific exempt record if "such examination would clearly not be in the public interest and would substantially and irreparably damage any person, or would substantially and irreparably damage vital governmental functions." RCW 42.56.540. "An agency has the option of notifying persons named in the record or to whom a record specifically pertains, that release of a record has been requested," so that person may take steps to enjoin release of the record, when appropriate. *Id*.

First of all, we address the city's concern that it is not expected or required to raise a third party's constitutional rights. We agree. *Contra Does* II, 27 Wn. App. 2d at 359 n.43. The person who is the subject of the public record is in the best position to identify what interest, if any, they hold that could be invaded as a result of disclosure of the public records. This third party notice provision under RCW 42.56.540 provides a mechanism for the agency to inform the subject of the

17

public record that the record has been requested, so that the third party may seek an injunction on that basis. That is precisely what occurred in this case, and we find no error.

The party seeking to prevent disclosure of public records bears the burden of proof. *Wash. Pub. Emps. Ass'n v. Wash. State Ctr. for Childhood Deafness & Hr'g Loss*, 194 Wn.2d 484, 492, 450 P.3d 601 (2019) (*WPEA*); *Spokane Police Guild*, 112 Wn.2d at 35. "A decision granting or denying an injunction under the PRA is reviewed de novo." *Lyft*, 190 Wn.2d at 791; *John Doe A. v. Wash. State Patrol*, 185 Wn.2d 363, 370-71, 374 P.3d 63 (2016).

RCW 42.56.540 creates the injunctive remedy "which allows a superior court to enjoin the release of specific public records if they fall within specific exemptions found elsewhere in the Act." *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 257, 884 P.2d 592 (1994) (*PAWS*) (emphasis omitted) (citing former RCW 42.17.330 (1992), *recodified as* RCW 42.56.540 (LAWS OF 2005, ch. 274, §103)). Obtaining an injunction under RCW 42.56.540 requires two steps: "First, the court must determine whether the records are exempt under the PRA or an 'other statute' that provides an exemption in the individual case. Second, it must determine whether the PRA injunction standard is met." *Lyft*, 190 Wn.2d at 789-90 (the two-step injunction inquiry "applies regardless of whether

the exemption at issue is expressly set out in the PRA or incorporated via an 'other statute'" (citing *PAWS*, 125 Wn.2d at 258; *Spokane Police Guild*, 112 Wn.2d at 36, 39)); *see also Soter v. Cowles Publ'g Co.*, 162 Wn.2d 716, 757, 174 P.3d 60 (2007) (plurality opinion). An injunction will not issue unless the proponent establishes *both* that an exemption applies *and* release would clearly not be in the public interest and would cause substantial and irreparable damage under RCW 42.56.540. *Lyft*, 190 Wn.2d at 790.

"In general, a party in a PRA case can obtain a TRO or a preliminary injunction before establishing a right to a permanent injunction." *SEIU Healthcare 775NW v. Dep't of Soc. & Health Servs.*, 193 Wn. App. 377, 392, 377 P.3d 214 (2016). For a preliminary injunction, "the trial court does not need to resolve the merits of the issues for permanent injunctive relief. Instead, the trial court considers only the *likelihood* that the moving party ultimately will prevail at trial on the merits." *Id.* at 392-93 (citation omitted) (citing *Nw. Gas Ass'n v. Wash. Utils. & Transp. Comm'n,* 141 Wn. App. 98, 116, 168 P.3d 443 (2007)). On the merits, a party must satisfy both parts of the PRA injunction standard—that an exemption applies *and* RCW 42.56.540 is satisfied—to obtain permanent injunctive relief in a PRA case. *Lyft*, 190 Wn.2d at 790. Thus, to obtain a *preliminary* injunction in this case, the officers must demonstrate a likelihood that they will

prevail on the merits as to both steps of the PRA injunction standard. *Id*.;

*SEIU Healthcare*, 193 Wn. App. at 393.

In this case, the Court of Appeals rejected this two-part PRA injunction

standard under the circumstances where the officers asserted their First Amendment

rights are implicated. *Does* II, 27 Wn. App. 2d at 356-61. Instead, the Court of

Appeals concluded that if disclosure would invade a constitutional right, "it is

entirely unnecessary for the citizen to establish an *additional* entitlement to an

injunction in order to preclude disclosure." *Id*. at 340. That novel analysis has no

application here where the officers requested injunctive relief under RCW 42.56.540

and therefore must satisfy its requirements in order to obtain an injunction pursuant

to that statute. CP at 495, 499; *Lyft*, 190 Wn.2d at 790 ("Given the broad range of

'other statutes' courts consider in connection with the PRA, consistent application

of the PRA requires the consistent procedural operation of the PRA injunction

standard regardless of the exemption or 'other statute' asserted. After all, PRA

exemptions are recognized through the operation of the PRA, not outside it.").

"[O]ur case law interpreting the PRA injunction statute makes clear that

finding an exemption applies under the PRA does not ipso facto support issuing an

injunction." *Lyft*, 190 Wn.2d at 786 (citing *Spokane Police Guild*, 112 Wn.2d at 36;

*Soter*, 162 Wn.2d at 757; *Morgan v. City of Federal Way*, 166 Wn.2d 747, 756-57,

213 P.3d 596 (2009); *Belo Mgmt. Servs., Inc. v. Click! Network*, 184 Wn. App. 649, 661, 343 P.3d 370 (2014); WASH. STATE BAR ASS'N, PUBLIC RECORDS ACT DESKBOOK: WASHINGTON'S PUBLIC DISCLOSURE AND OPEN PUBLIC MEETINGS LAWS § 17.3, at 17-11 (2d ed. 2014)). In a PRA case such as this, the party seeking an injunction must satisfy the two-part analysis—first, that the records are exempt, *and* second, that disclosure would clearly not be in the public interest and would substantially and irreparably damage a person or governmental function. *Id*. at 786-91; RCW 42.56.540. To the extent the Court of Appeals held that the second step is not required, we reverse. The two-part PRA injunction standard continues to apply to cases seeking such relief under the PRA.

    II.    Likelihood of Success on the Merits

To determine whether the officers have demonstrated a likelihood of success under the two-part PRA injunction standard, we consider first, whether they have shown the records are likely exempt, and second, whether they have shown disclosure likely should be enjoined under RCW 42.56.540. *Lyft*, 190 Wn.2d at 790-91, 779-80 (if the information is exempt, "then 'judicial inquiry commences' with the court applying the PRA injunction standard" (quoting *Spokane Police Guild*, 112 Wn.2d at 36)); *Bainbridge Island Police Guild v. City of Puyallup*, 172 Wn.2d 398, 408, 259 P.3d 190 (2011) (plurality opinion). We acknowledge the

21

limited record in this case; given that we are analyzing the standard used to assess whether preliminary injunctive relief is appropriate, we proceed on this analysis, recognizing that additional facts may be adduced at the trial court that might result in a different outcome.

The PRA requires government agencies to disclose all public records unless the record falls within a specific exemption under the PRA or other statute that prohibits disclosure of specific information or records. RCW 42.56.070(1). The officers argue their identities associated with public records of their participation on January 6th should be exempt either under a specific PRA exemption—private personal information exempt under RCW 42.56.230(3)—or because the First Amendment is an "other statute" that prohibits disclosure under RCW 42.56.070(1). CP at 500-08.

In the public records context, courts must first consider the PRA's exemptions before reaching a constitutional argument: "we believe it is appropriate to begin our review with the statute's provisions, as we have previously concluded in the PRA context that reviewing courts 'should not pass on constitutional issues unless absolutely necessary to the determination of the case.'" *WPEA*, 194 Wn.2d at 493 (considering privacy rights based on specific PRA exemptions, rather than article I, section 7) (internal quotation marks omitted) (quoting *Bellevue John Does*,

22

164 Wn.2d at 208 n.10); *see also Wash. Fed'n of State Emps. v. State*, 2 Wn.3d 1, 14, 534 P.3d 320 (2023) (*WFSE*) (considering whether a specific PRA provision exempted public records, rather than a constitutional liberty interest). Additionally, "[t]he PRA's express grounds for exemptions should be examined first before considering whether an 'other statute' exemption applies." *WFSE*, 2 Wn.3d at 26 (quoting RCW 42.56.070(1)). Therefore, the exemption analysis must begin with the officers' claim that their identities associated with these public records likely fall under the specific PRA exemption for privacy in personal information.

### A. Statutory Privacy Exemption

The officers argue their identities are likely exempt based on the PRA's specific exemption for privacy in personal information. RCW 42.56.230(3), .050. Some exemptions under the PRA are conditional, exempting certain information or public records "in furtherance of only certain identified interests, and only insofar as those identified interests are demonstrably threatened in a given case." *Resident Action Council*, 177 Wn.2d at 434. The personal information exemption is conditional: "personal information" regarding public employees is exempt only "to the extent that disclosure would violate their right to privacy." RCW 42.56.230(3). "A person's 'right to privacy[]' . . . is invaded or violated only if disclosure of information about the person: (1) [w]ould be highly offensive to a reasonable person,

and (2) is not of legitimate concern to the public." RCW 42.56.050. Stated differently, to determine whether public records fall under this exemption, courts must ask a series of four questions: First, do the records contain personal information? Second, if so, do the subjects of the records have a right to privacy in that information? Third, if so, would disclosure be highly offensive to a reasonable person? And fourth, is disclosure not of legitimate concern to the public? The records are exempt only if the answer to all four questions is "yes." *E.g.*, *Predisik v. Spokane Sch. Dist. No. 81*, 182 Wn.2d 896, 903-08, 346 P.3d 737 (2015) (requiring existence of personal information, right to privacy, and violation of privacy through disclosure to find an exemption); *Bainbridge Island Police Guild*, 172 Wn.2d at 411 (same).

The officers bear the burden of demonstrating the records are likely exempt; they must show the answer to each of those four questions is "yes." *WPEA*, 194 Wn.2d at 492. We conclude they have not met that burden because they have not shown they have a privacy right in public records about their attendance at a highly public event (the second question). We therefore do not reach the additional questions of whether disclosure would be highly offensive to a reasonable person and not of legitimate concern to the public, as they have not demonstrated a right to

privacy under the PRA that could be invaded by disclosure. *See Predisik*, 182 Wn.2d at 904.

### 1. *Personal Information*

First, this exemption applies only to "personal information." RCW 42.56.230. Though the requested public records have not yet been made part of the case file or reviewed by any court, it appears they contain photographs, video, text messages, and possibly other documentation relating to the officers' activities on January 6, 2021; the officers argue the information that should be exempt from disclosure is their identities and identifying information within those records.

Though the PRA does not define "personal information", we have previously looked to the ordinary dictionary definition. *Bellevue John Does*, 164 Wn.2d at 211. "Personal" means "of or relating to a particular person : affecting one individual or each of many individuals : peculiar or proper to private concerns : not public or general." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1686 (2002). Under this definition, identities of particular people are considered "personal information" because they relate to particular people. *Bellevue John Does*, 164 Wn.2d at 211; *see also Predisik*, 182 Wn.2d at 904. The officers' identities qualify as personal information; therefore, we must next inquire whether the officers have demonstrated

a right privacy in that information that could be invaded by disclosure. RCW 42.56.230(3); *see Bellevue John Does*, 164 Wn.2d at 212.

## 2. *Right to Privacy*

Second, personal information falls within this exemption only if the public employee can "also demonstrate that they have a right to privacy in personal information contained in a record *and if such a right exists* that disclosure would violate it." *Predisik*, 182 Wn.2d at 904. In other words, *before* considering whether disclosure would invade the officers' right to privacy, we must first determine whether they *have* a right to privacy in the requested records. *See Bellevue John Does*, 164 Wn.2d at 212-17.

"The right of privacy is commonly understood to pertain only to the intimate details of one's personal and private life." *Spokane Police Guild*, 112 Wn.2d at 38 (citing RESTATEMENT (SECOND) OF TORTS § 652D at 386 (AM. L. INST. 1977); *Hearst*, 90 Wn.2d at 138; *Cowles Publ'g Co. v. State Patrol*, 109 Wn.2d 712, 726, 748 P.2d 597 (1988) (plurality opinion)); *see also Bellevue John Does*, 164 Wn.2d at 212. This court first recognized this definition of privacy for purposes of the PRA in *Hearst*, where we looked to the common law definition of a privacy right expressed in tort law:

> "Every individual has some phases of his life and his activities and some facts about himself that he does not expose to the public eye,

26

but keeps entirely to himself or at most reveals only to his family or to close personal friends. Sexual relations, for example, are normally entirely private matters, as are family quarrels, many unpleasant or disgraceful or humiliating illnesses, most intimate personal letters, most details of a man's life in his home, and some of his past history that he would rather forget. When these intimate details of his life are spread before the public gaze in a manner highly offensive to the ordinary reasonable man, there is an actionable invasion of his privacy, unless the matter is one of legitimate public interest."

90 Wn.2d at 136 (quoting RESTATEMENT (SECOND) OF TORTS § 652D cmt. b at 386).

This definition has since been expressly adopted by the legislature. RCW 42.56.050; LAWS OF 1987 ch. 403, § 1. "[T]he PRA will not protect everything that an individual would prefer to keep private. The PRA's 'right to privacy' is narrower. Individuals have a privacy right under the PRA only in the types of 'private' facts fairly comparable to those shown in the *Restatement*." *Predisik*, 182 Wn.2d at 905.

Public employees generally do not have a privacy interest in activities that are widely attended and do not occur in private. For example, *Spokane Police Guild* involved a public records request for a Liquor Control Board investigative report, which was not exempt based on any right to privacy. 112 Wn.2d at 38-39. The report found that a dance performance at a bachelor party, attended by many public employees and held at the Spokane Police Guild Club premises, violated Liquor Board regulations. *Id*. at 31. We concluded the report was *not* exempt under the PRA because there were 40 or more people on premises licensed by the Liquor

27

Board, so the unedited report should be released under the PRA—including the names of the attendees. *Id*. at 37-40. The number of people and location indicated there was "no personal intimacy involved in one's presence or conduct at such a well attended and staged event which would be either lost or diminished by being made public." *Id*. at 38.

Like in *Spokane Police Guild*, the public records requested here relate to public employees' presence and actions at a highly attended public event. Records regarding events with many people in a public setting are less likely to implicate the PRA right to privacy because public activities are facts about a person they "'expose to the public eye,'" not the intimate details of their private life. *Hearst*, 90 Wn.2d at 136 (quoting RESTATEMENT (SECOND) OF TORTS § 652D cmt. b at 386). The officers do not point to any evidence that shows they took steps to conceal their identities so they could attend the event anonymously; instead, they made the choice to attend a public event where they could expect to be seen by others. At this stage of the proceeding, the officers have not shown any meaningful difference between their public conduct giving rise to the public records in this case and the public conduct in *Spokane Police Guild*. These records relate to their participation at a public rally at the National Mall along with 45,000 other attendees, at a highly publicized event they could expect would be documented by news media. Like in *Spokane Police*

*Guild*, the officers have shown "no personal intimacy" in their presence "at such a well attended and staged event." 112 Wn.2d at 38. We acknowledge that additional facts may arise from the trial court's application of this case as proceedings continue.

Rather than addressing *Spokane Police Guild*, the officers emphasize that they attended the January 6th events while off duty and that the OPA did not sustain allegations of misconduct as to the four officers who remain as plaintiffs/respondents. Neither fact is dispositive here. *Spokane Police Guild* involved a "social event" the public employees attended "on their own time," and yet this court found that they did not have a right to privacy in their identities as attendees at the event, as documented in the public record. *Id*. at 39. Further, off-duty acts of a police officer can be disclosable if their actions "bear upon [their] fitness to perform public duty" because "privacy considerations are overwhelmed by public accountability." *Cowles*, 109 Wn.2d at 726-27. The officers must do more than show that the public records relate to their off-duty conduct in order to demonstrate a privacy interest under the PRA.

Instead, the officers urge for a broad rule that public records related to unsustained[14] misconduct allegations are categorically private under *Bellevue John*

---

[14] As noted, OPA's findings were "[i]nconclusive" as to one of the plaintiff/respondent officers because he may have entered a restricted area on the Capitol grounds. CP at 550-51.

*Does*. But that decision reached a narrower holding than what the officers urge: "the identities of public school teachers who are subjects of unsubstantiated allegations of sexual misconduct are exempt from disclosure" under the PRA. *Bellevue John Does*, 164 Wn.2d at 205 (footnote omitted); *see also Predisik*, 182 Wn.2d at 907 ("We do not read *Bellevue John Does* to create a sweeping rule that exempts an employee's identity from disclosure any time it is mentioned in a record with some tangential relation to misconduct allegations."). On the other hand, "a law enforcement officer's actions while performing [their] public duties or improper off duty actions in public which bear upon [their] ability to perform [their] public office do not fall within the activities to be protected" by the PRA's right to privacy. *Cowles*, 109 Wn.2d at 727.

As the requested records in this case have not been made part of the case file or the record on review, this court cannot assess whether they resemble false allegations of sexual misconduct by a teacher against a student like in *Bellevue John Does*, or something more akin to improper off-duty actions in public, which are not entitled to the protection of personal privacy under *Cowles*. That analysis needs to occur at the trial court, which has records not part of this appeal and is capable of reviewing records in camera, if necessary. At this point, our record on appeal shows, and the officers do not dispute, that all of them attended the rally

30

on January 6th and one of the plaintiff/respondent officers went with the crowd to the Capitol afterward. We know that the public records requests sought not just information about OPA's investigation into possible misconduct but more broadly requested any information related to the officers who were present in Washington, DC, that day, regardless if they engaged in actions amounting to professional misconduct by the standards of their employer. And we know that the plaintiffs/respondents admit that they are the officers who traveled to Washington, DC, and attended the rally there on January 6th, in public, with thousands of other people and members of the news media there to witness their presence, and they reported as much to their public employer.

The actions a person takes in public are not the kind of information typically considered the sort of intimate details in one's personal life that one "'does not expose to the public eye.'" *Hearst*, 90 Wn.2d at 136 (quoting RESTATEMENT (SECOND) OF TORTS § 652D cmt. b at 386). As PRA exemptions must be narrowly construed, we conclude that a public employee must do more to establish a privacy interest in the fact of their attendance at events in a public setting with many other people present. RCW 42.56.030; *Spokane Police Guild*, 112 Wn.2d at 38. As the officers have not shown they likely have a right to privacy under the PRA, we do not reach the additional questions whether disclosure of the public

records would violate such a right. *Predisik*, 182 Wn.2d at 907 (citing RCW 42.56.050). At this stage of the proceeding, on these limited facts, the officers have not satisfied the requirements for a preliminary injunction because they have not carried their burden to show that this narrow exemption applies to the fact of their identities as the public employees who attended the January 6th events, as documented in public records, as a matter of law. RCW 42.56.030; *WPEA*, 194 Wn.2d at 492. Further proceedings may conclude otherwise.

The Court of Appeals erred in declining to analyze the officers' claim of a statutory exemption first, and the trial court correctly denied the preliminary injunction on the basis that the officers failed to demonstrate they likely have a statutory right to privacy exempting disclosure under the PRA. The officers have not shown a likelihood of success on the merits of the first step of the injunction test on this basis.

B.    Constitutional Privacy Exemption

The officers argue in the alternative that even if their identities are not exempted by a statutory right to privacy, they should be exempted by a constitutional right to privacy emanating from the First Amendment. Neither their complaint nor their motion for a preliminary injunction included prayer for relief that the PRA be declared unconstitutional; rather, the officers raised the First Amendment as an

additional basis to object to the presumption of release under the PRA, as an "other statute" under RCW 42.56.070(1).

Agencies must release all requested public records unless the record falls within a specific exemption under the PRA "or other statute which exempts or prohibits disclosure of specific information or records." RCW 42.56.070(1). "The 'other statutes' exemption incorporates into the Act other statutes which exempt or prohibit disclosure of specific information or records." *PAWS*, 125 Wn.2d at 261-62 (citing former RCW 42.17.260(1) (1992), *recodified as* RCW 42.56.070(1) (LAWS OF 2005, ch. 274, § 284)). Consistent with our prior decisions, we agree the catchall "other statutes" provision allows a person to object to disclosure of public records based on constitutional principles. *See Freedom Found. v. Gregoire*, 178 Wn.2d 686, 696-98, 310 P.3d 1252 (2013) (constitutional separation of powers creates an executive communications privilege that exempts certain public records from disclosure under the PRA); *see also Yakima v. Yakima Herald-Republic*, 170 Wn.2d 775, 808, 246 P.3d 768 (2011) (acknowledging in dictum that the argument that the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution provide exemptions under the "other statutes" provision "has force"). Like the analysis for specific PRA statutory exemptions, we begin our analysis with the question of whether the record or information is private before considering

33

whether disclosure would invade privacy or whether such an invasion would be permissible. *See Predisik*, 182 Wn.2d at 904; *Bainbridge Island Police Guild*, 172 Wn.2d at 411.

The value of privacy has been recognized not only in the actions of the legislature but also in constitutional text and penumbras. *See, e.g.*, WASH. CONST. art. I, § 7; *Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965) (citing U.S. CONST. amends. I, III, IV, V, IX); *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87, 91, 103 S. Ct. 416, 74 L. Ed. 2d 250 (1982) (citing U.S. CONST. amend. I). Here, the officers argue the First Amendment provides a privacy right in their identities within these public records.[15] They contend their attendance at the January 6th rally was an exercise of their First Amendment right to attend a political demonstration, they had a right to do so anonymously, and revealing their identities is compelled speech that could have an impermissible chilling effect on the exercise of those rights. Taking these arguments in turn, we conclude that for similar reasons that the officers failed to show a likely statutory privacy interest, they do not show a likely

---

[15] They do not assert any other provision of the United States or Washington Constitution. CP at 507-08.

constitutional privacy interest in their identities as the subjects of these public records.

No one disputes that the officers had a constitutional right to attend the rally—but that is not the issue in this case. This is not a case about whether public employees had a right to attend a rally in Washington, DC. This is not a case involving government action conditioning or prohibiting exercise of such a right: the officers were not prohibited from attending a political rally. Indeed, their public employer concluded that absent any illegal conduct, the officers had a right to attend the rally and doing so would not be grounds for adverse employment action. Though no one disputes the officers could engage in political expression and attend the rally, it does not necessarily follow that the fact of their attendance at such an event is private under the First Amendment.

Moreover, the officers do not point to any evidence demonstrating they took measures to attend the rally anonymously or to exercise their political beliefs in private. As discussed, both the rally and its purpose were widely publicized, the officers did nothing to hide their identities while attending the rally, and they were there among thousands of other people and members of the news media documenting it. And while political beliefs may be closely and personally held *in general*, these public employees made the choice to attend a highly publicized political event

35

in public. *Contra, e.g., Nat'l Ass'n for Advancement of Colored People v. Ala. ex rel. Patterson*, 357 U.S. 449, 466, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958) (the Fourteenth Amendment protects a *private* association's membership list from compelled disclosure in discovery to preserve the members' right "to pursue their lawful private interests *privately* and to associate freely with others" (emphasis added)); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 343, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995) (the tradition of anonymity in political advocacy is "best exemplified by the *secret* ballot" (emphasis added)).[16] We come to this conclusion without asserting these public employees' political beliefs; those are not in this record and we draw no conclusions about them. Rather, our analysis turns on the public nature of the event, not its political meaning or the officers' beliefs. Again, as the officers have raised the First Amendment as a basis for exemption under the PRA—under which exemptions must be construed narrowly, RCW 42.56.030—rather than as a challenge to the constitutionality of the PRA, we must view this proposed exemption narrowly. *Lyft*, 190 Wn.2d at 790 ("After all, PRA exemptions are recognized through operation of the PRA, not outside it."). As

---

[16] To the extent the officers argue disclosure of their identities is compelled, such compulsion, if any, would have occurred at the time of the OPA investigation, not the release of public records now already in existence. Moreover, this lawsuit does not challenge whether the OPA improperly required the officers to participate in the investigation.

with the statutory privacy exemption, the officers have not shown they likely have a privacy interest under the First Amendment that would reach the fact of their identities as the public employees who attended these public events documented in public records.

As the officers have not shown a likely privacy interest in this information under the First Amendment theory, we do not reach the additional questions of whether disclosure would have a chilling effect or would otherwise invade such a right, or whether disclosure would nevertheless be justified. At this stage in the proceedings, the officers have not met their burden of showing their identities are likely exempt under either their statutory or constitutional theories of a privacy interest. Therefore, they have not shown a likelihood of success on the first step of the PRA injunction standard—exemption—and so we do not reach the second step of whether disclosure would cause substantial and irreparable damage justifying an injunction under RCW 42.56.540. *Id.*; *PAWS*, 125 Wn.2d at 257-58; *Spokane Police Guild*, 112 Wn.2d at 36. The trial court properly denied the motion for preliminary injunction; we reverse.

III.   Pseudonyms

Last, Sueoka argues the lower courts erred in permitting the officers to proceed under pseudonyms in this litigation. We agree. The Washington

37

Constitution requires that "[j]ustice in all cases shall be administered openly." WASH. CONST. art. I, § 10. A court record may be redacted upon a court's written finding that doing so "is justified by identified compelling privacy or safety concerns that outweigh the public interest in access to the court record." GR 15(c)(2). We have held that names in court pleadings are subject to article I, section 10 and GR 15. *John Doe G. v. Dep't of Corr.*, 190 Wn.2d 185, 201, 410 P.3d 1156 (2018). Therefore, the use of pseudonyms must satisfy the five-step framework set forth in *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 640 P.2d 716 (1982):

> *Ishikawa* requires the court to (1) identify the need to seal court records, (2) allow anyone present in the courtroom an opportunity to object, (3) determine whether the requested method is the least restrictive means of protecting the interests threatened, (4) weigh the competing interests and consider alternative methods, and (5) issue an order no broader than necessary.

*John Doe G.*, 190 Wn. 2d at 199 (citing *Ishikawa*, 97 Wn.2d at 37-39). Decisions regarding sealing records are reviewed for abuse of discretion. *State v. Richardson*, 177 Wn.2d 351, 357, 302 P.3d 156 (2013). "Because court records are presumptively open, the burden of persuasion rests on the proponent of continued sealing." *Id*. at 359-60.

Here, the superior court initially granted the officers permission to proceed in pseudonym after conducting a written analysis of the *Ishikawa* factors, as required. As to the first factor, the court concluded the officers had a demonstrated need to

proceed anonymously because proceeding under their given names in this action would deprive them of a meaningful opportunity for a fair disposition of the merits of their substantive claims to prevent disclosure of their identities. Sueoka later moved to change the case title and disallow pseudonyms, arguing that the calculus has since changed because the officers have been named publicly, as demonstrated in the disputed exhibits. Though we disagree with Sueoka on that point, we nevertheless agree that the officers have not shown a need to seal the court records. *See John Doe G.*, 190 Wn.2d at 200 (requiring "a showing that pseudonymity was necessary" under *Ishikawa* in order to redact names in pleadings).

When the trial court considered the disputed exhibits and the motion to intervene, counsel for the plaintiffs/respondents and counsel for the intervenors could not answer the question of whether they represented the same people, and counsel never confirmed nor denied that the plaintiff/respondent officers are in fact the people identified in the disputed exhibits. We cannot say, on this record, that the officers' identities have been confirmed in public or on the record in court.

Nevertheless, the officers have not made the required showing to proceed under pseudonyms. The "need" the officers advance in favor of anonymity is to prevent the harm of an invasion of their statutory or constitutional privacy rights. As explained above, the officers have not shown they likely have a privacy interest in

their identities within these public records of their participation in public events. Without demonstrating such a privacy interest that could be invaded by disclosure of their identities within public records, the officers cannot show a compelling privacy concern "that outweigh[s] the public interest in access to the court record." GR 15(c)(2); *John Doe G.*, 190 Wn.2d at 200. We conclude they have not satisfied the first requirement of a need to litigate anonymously under *Ishikawa* in order to overcome the presumption of open court records. *Richardson*, 177 Wn.2d at 359-60. We reverse the trial court's order permitting pseudonyms.

CONCLUSION

We reverse the Court of Appeals and hold that the officers have not shown a likelihood of success on the merits that their identities are exempt based on either a statutory or constitutional right to privacy. The trial court therefore correctly denied the preliminary injunction because the officers did not satisfy the first part of the two-part PRA injunction test. Nor have the officers demonstrated a need to litigate under pseudonym. We reverse and remand to the trial court for further proceedings consistent with this opinion.

Montoya-Lewis, J.

WE CONCUR:

Johnson, J.

Yu, J.

González, J.

Owens, J.P.T.

No. 102182-8

STEPHENS, C.J. (concurring in part, dissenting in part)—I concur in the majority's decision to reverse the Court of Appeals and reinstate the trial court order denying a preliminary injunction. The result is to remand the case to the trial court to consider the records at issue based on current circumstances, which the parties acknowledge have changed in the years since the initial motions were considered.

I write separately because I believe the trial court must also have an opportunity to address the pseudonym issue on remand based on current circumstances. As the majority notes, a trial court's decision to allow a party to litigate anonymously using a pseudonym constitutes a partial "closure" of court proceedings implicating article I, section 10. *John Doe G v. Dep't of Corr.*, 190 Wn.2d 185, 201, 410 P.3d 1156 (2018). It must therefore be supported by findings pursuant to the multifactored analysis in *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 640 P.2d 716 (1982). And appellate review of the trial court's decision is solely for abuse of discretion, without invoking the benefit of hindsight to second-guess that decision. *State v. Richardson*, 177 Wn.2d 351, 357, 302 P.3d 156 (2013).

This case is before us, for a second time, with *unchallenged* findings entered by Judge Cahan supporting the order to allow the Does to litigate in this action under pseudonyms. Clerk's Papers (CP) at 247-48. Sam Sueoka does not argue that the court abused its discretion, nor does the majority find any abuse of discretion. Indeed, the majority, like Judge Widlan below, rejects Sueoka's only argument: that the apparent disclosure of the Does' identities requires reversing the pseudonym order. Majority at 36-37; 2 Verbatim Rep. of Proc. (Jan. 28, 2022) (VRP) at 85-86.

Given this procedural posture and the deferential standard of review, I cannot join the majority's decision to reverse the trial court's order on the ground that it was never justified. The majority concludes that the Does never demonstrated any need to litigate using pseudonyms because they cannot show a likelihood of success on the merits of their privacy claims. More precisely, their claims likely fail because they were participating in public events. Majority at 37.

I have two concerns with this holding. First, it does not align with abuse of discretion review, which requires us to stand in the shoes of the trial court and consider the known circumstances at the time of the action in question. As the trial court noted, the Does' asserted need to avoid disclosure of their identities while they sought to redact their names from public records reflected potential concerns

about collateral consequences.  CP at 247.  While these concerns may seem less weighty today than four years ago, we cannot rely on subsequent facts and hindsight—particularly because we do not make factual findings and we have no basis to reject the trial court's factual findings, which have not been challenged.

Second, and more fundamentally, I worry that the majority's conclusion is too categorical, resting entirely on the analysis of the Does' asserted privacy rights under the preliminary injunction standard.  The majority reasons that if the Does are unlikely to sustain a statutory or constitutional privacy claim for their participation in public events, then they have no need to protect their identities while litigating in a PRA action.  This line of reasoning seems to erase any practical concerns with the scope of disclosure of one's identity, which is adjacent to but distinct from the legal standards for proving privacy claims.  And as Judge Widlan recognized, lifting the pseudonym order in the context of ongoing litigation over a PRA injunction could deny the Does the benefit of potential success in the litigation, effectively ending the case.  VRP at 85-86.

To be clear, I am not suggesting that a party seeking to avoid disclosure of public records need only assert a privacy interest in order to litigate anonymously.  Every motion for use of a pseudonym in court documents must be evaluated on its individual merits.  That was done here, and the *Ishikawa* findings supporting the

pseudonym order have not been challenged. The case will now return to the trial court, and I would allow the trial court to pick up exactly where it left off. I would uphold both of the trial court's orders—denying the preliminary injunction and allowing the use of pseudonyms at this juncture. Any reconsideration of the pseudonym issue should be left to the trial court, based on the facts and circumstances that can be determined only in that court.

With these observations, I join the majority in reversing the Court of Appeals with respect to the preliminary injunction and dissent in part to affirm the Court of Appeals with respect to the use of pseudonyms.

_____
Stephens, C.J.

_____
Madsen, J.

No. 102182-8

GORDON McCLOUD, J. (concurring in part/dissenting in part)—I agree with the majority's holding that the records requested by petitioner Sam Sueoka concern public, not private, activity and, hence, that they must be disclosed under the Public Records Act (PRA), chapter 42.56 RCW. Majority at 3 ("However, the requested records relate to their activities at a highly publicized and public event. On this limited record, it appears that the officers have not demonstrated a likely privacy interest in such information . . . .").

But I disagree with its characterization of the privacy rights exempt from PRA disclosure as "narrow" or as limited to those contained in a legislatively enacted statute. *E.g.*, majority at 2 ("The PRA exempts some public records from disclosure, balancing the imperative that the people remain informed against narrow privacy rights or government interests that may, at times, outweigh the PRA's broad policy in favor of disclosure."), 34 ("Again, as the officers have raised the First Amendment [to the United States Constitution] as a basis for exemption under the PRA—under which exemptions must be construed narrowly, RCW 42.56.030—rather than as a challenge to the constitutionality of the PRA, we

1

must view this proposed exemption narrowly."). We should, instead, acknowledge

that both the United States Constitution (which the Does[1] argued) and the

Washington Constitution (which they did not argue) provide broad protection of

privacy rights and that neither the United States Supreme Court nor this court has

ever ruled that its constitution's protection of the right to privacy must be

interpreted "narrowly."

I therefore also disagree with the majority's choice of the procedure to be

used when a party seeks to enjoin disclosure of material that purportedly invades

that party's constitutional right to privacy. It is true that we have, in the recent past,

ruled that "[i]n a PRA case such as this, the party seeking an injunction must

satisfy the two-part analysis—first, that the records are exempt, *and* second, that

disclosure would clearly not be in the public interest and would substantially and

irreparably damage a person or governmental function." Majority at 20 (citing *Lyft,*

*Inc. v. City of Seattle*, 190 Wn.2d 769, 786-91, 418 P.3d 102 (2018); RCW

42.56.540). But as I explained in the *Lyft* case, that two-part standard eviscerates

the foundational right to privacy guaranteed to Washingtonians. *Id.* at 803-05

(Gordon McCloud, J., concurring in concurrence/dissent).  As applied to this case,

it means that the majority is using a statutory/court rule standard that authorizes a

---

[1] Respondents John Does 1, 2, 4, and 5.

2

judge to take documents that the United States Constitution considers "private" and yet disclose them anyway.  When a statutory/court rule standard like that (here, compelling disclosure) and a constitutional protection of individual rights (here, protecting the right to privacy) conflict, then the constitutional protection must control—not the contrary statutory/court rule standard.

However, in this case, I agree with the majority's ultimate conclusion that the Does did not establish a right to privacy, even under the United States Constitution, in their voluntary decision to appear in a classic public forum (the National Mall) at a large, well-publicized, media-attractive demonstration. I therefore concur in the majority's decision to reverse the Court of Appeals' decision to the contrary.

But I do not agree with the majority's resolution of the other issue in this case—that is, the issue of whether the officers could proceed via pseudonyms while litigating this case until the trial court makes its final decision on whether disclosure of the documents sought would violate the officers' right to privacy. Majority at 35-38. Instead, I agree with the concurrence-in-part's resolution of that issue: plaintiffs seeking to enjoin disclosure of private information in response to a PRA request should have the opportunity to litigate in a way that enables them to reap the fruits of their victory, if they win. Concurring in part, dissenting in part (Stephens, C.J.) at 2-4. That means litigating via pseudonym.

I therefore respectfully concur in the majority's resolution of the injunctive relief issue, dissent from its resolution of the pseudonym issue, and instead agree fully with the concurrence-in-part's resolution of that pseudonym issue.

_____
Gordon McCloud, J.

_____
Whitener, J.